IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                    Case No. 3:11CR508

        Plaintiff /Respondent,

                                                              **ORDER**

       v.

Goldy Thompson,

        Defenant/Petitioner.

This is a federal prisoner's collateral attack under 28 U.S.C. § 2255.

In 2012, a jury convicted the petitioner, Goldy Thompson, of being a felon in possession of a firearm, 18 U.S.C. § 922(g). I sentenced him to seventy-two months' imprisonment. The Sixth Circuit affirmed. *U.S. v. Thompson*, 570 F. App'x 466 (6th Cir. 2014).

Thompson now contends trial counsel was ineffective for not: 1) questioning witness Christopher McCall about "pending criminal charges," as to which the government, in exchange for McCall's testimony, allegedly "provided him a deal"; 2) challenging the racial make-up of the petit jury; 3) advising Thompson of his right to petition the U.S. Supreme Court for a writ of certiorari; 4) calling three additional witnesses at the hearing on Thompson's motion to suppress the firearm; and 5) investigating this court's "lack of jurisdiction." (Doc. 88 at 4, 10).

In a supplement to the motion, Thompson also argues his sentence is invalid under *Johnson v. U.S.*, — U.S. —, 135 S. Ct. 2551 (2015). (Doc. 94).

For the following reasons, I deny the motion in part and hold the remainder of the motion in abeyance, pending receipt, as described below, of further submissions from the parties

## Background

In the early morning hours of October 2, 2011, Alice King, the manager of the Quality Bar in Toledo, Ohio, called 911 to report a man inside the bar waving a gun around.

King testified that a confrontation erupted shortly before the bar's closing at 2:30 a.m. A bouncer, Chris McCall, told her there was a man with a gun and to call 911. From behind the bar, King called 911 and said there was a black man, wearing black pants and a black top, threatening people with a gun.[1]

King did not, however, see the man's face.

McCall, the bouncer, testified he was bringing ice up to the bar when he saw a fight break out on the dance floor.

He approached the two men involved, one of whom was Goldy Thompson. Thompson, who was wearing a black hoodie and black sweat pants – and whom McCall had seen in the bar before – "pulled out [a] gun, told me don't touch him." (Doc. 80 at 44). Thompson "wav[ed the gun] around," causing patrons in the bar to back away from him. (*Id.* at 46). McCall told King to call the police.

McCall recognized several bar patrons as Thompson's friends, and he asked them to get Thompson out of the bar. Eventually, Thompson's friends were able to get him outside the bar, by

---

[1] The prosecution played the 911 call for the jury. At one point during the call, King asked, "Where's Chris at?"

which time the police had arrived on the scene. When McCall stepped outside the bar, he saw that police had already taken Thompson into custody.

McCall acknowledged he had a prior felony conviction for burglary.

Officer Nicholas Bocik of the Toledo Police Department testified he responded to a weapons call at the Quality Bar. When Bock arrived on scene, he saw a man outside the bar fitting the description he had received from the dispatcher: a black male wearing all black clothes.

Bocik got out of his patrol car and, while walking briskly toward the suspect, ordered him to stop and show his hands. The suspect did not heed the command, so the officer repeated himself and continued to approach. When the suspect turned around, he shoved Officer Bocik, and the two fell to the ground.

During the struggle, Bocik saw a gun fall out of the suspect's hands. Another police officer recovered the gun.

The suspect's identification indicated he was Goldy Thompson.

Special Agent Dennis Bennett testified the gun was a Smith and Wesson .40 caliber pistol. According to Bennett, Smith and Wesson manufactured all of their guns in Massachusetts.

The defense called Thompson's uncle, Wiley Wilson. Wilson, a regular at the Quality Inn, testified he did not see McCall working the night police arrested his nephew. He also testified Thompson was not involved in the altercation that broke out on the dance floor.

After hearing this evidence, the jury found Thompson guilty of violating § 922(g).

According to the presentence report, Thompson – due to several enhancements to his offense level and his extensive criminal record – faced a Guidelines range of between 324 to 405 months'

3

imprisonment. But the statutory maximum for the felon-in-possession conviction was ten years' imprisonment, *see* 18 U.S.C. §§ 922(g)(1) & 924(a)(2), and I imposed a six-year prison term.

## Discussion

To prevail on a motion to vacate under § 2255, the petitioner "must demonstrate the existence of an error of constitutional magnitude which has a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Humphress v. U.S.*, 398 F.3d 855, 858 (6th Cir. 2005). If the petitioner alleges a non-constitutional error, he must establish the error amounts to a "fundamental defect which inherently results in a complete miscarriage of justice" or "a violation of due process." *Watson v. U.S.*, 165 F.3d 486, 488 (6th Cir. 1999) (internal quotation marks omitted).

### A. Ineffective Assistance

To prevail on his ineffective-assistance claim, Thompson must "show both that his counsel provided deficient assistance and that there was prejudice as a result." *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

The performance prong calls for "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* at 110. My review of counsel's performance must be highly deferential, and I am "required not simply to give [counsel] the benefit of the doubt, but to affirmatively entertain the range of possible reasons counsel may have had for proceeding as [he] did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011).

With respect to prejudice, Thompson "must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Harrington*, *supra*, 562 U.S. at 104.

"This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case." *Id.* at 111-12

### 1. Pending Charges Against McCall

Thompson first alleges trial counsel was ineffective for not cross-examining McCall about a deal McCall allegedly received in a pending case. According to Thompson, McCall was facing criminal charges in an unrelated case, and the government, to induce his testimony against Thompson, agreed to offer McCall "leniency" in that pending case. (Doc. 93 at 2).

The government contends Thompson makes only a "bald assertion" to support his claim regarding the alleged deal, but "fails to support it with any evidence." (Doc. 90 at 2). It also argues Thompson cannot show prejudice, given that defense counsel impeached McCall with the fact of his prior burglary conviction.

The record, as it presently stands, does not shed much light on whether there was a "deal" between McCall and the government.

When trial began on Wednesday, August 12, 2012, Thompson's lawyer represented that the government did not discover McCall or learn the substance of his testimony until Monday, August 10 – two days before trial. (Doc. 80 at 2). The prosecutor then confirmed that, when Alice King came to the U.S. Attorney's Office that Monday to discuss her testimony, she had brought McCall with her. (*Id.* at 3-4). After speaking with McCall, the prosecutor called Thompson's lawyer and relayed to him the substance of McCall's testimony. (*Id.* at 4).

The only mention at trial of anything criminal in McCall's background was the fact he had a prior felony conviction.

Given the absence of more definitive evidence as to whether there was, in fact, a "deal" between the prosecution and McCall, I will hold a ruling on this portion of Thompson's ineffective-assistance claim in abeyance, pending:

- The government's submission, on or before March 15, 2016, of an affidavit responsive to Thompson's allegation there was a "deal" whereby the government agreed to provide leniency to McCall in a case pending against him in exchange for McCall's testimony against Thompson; and

- Thompson's submission, on or before May 2, 2016, of a counter-affidavit responsive to the government's submission.

## 2. Fair-Cross-Section Requirement

Thompson next alleges counsel should have "investigate[d] the racial make up of the petite [*sic*] jury." (Doc. 88 at 5). He claims there was "no diversity" on the jury, as it "only had white people on it." (*Id.*).

"The Sixth Amendment requires that the jury venire from which a jury is selected represent a fair cross-section of the community." *U.S. v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998). A defendant may establish a prima facie fair-cross-section violation by showing:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Thompson has not made out a *prim*a facie case, as he has not alleged – let alone pointed to evidence suggesting – the racial composition of "venires" within this District are not "fair and reasonable in relation to the number of [African-Americans] in the community." *Id.*

The fact that the jury in Thompson's case had no African-American members is not dispositive. He "must show more than that [his] particular panel was unrepresentative. *Duren* states that [courts] look at the "venires" from which "juries" are selected, and it has long been the case that defendants are not entitled to a jury of any particular composition – only to a panel from which distinctive groups were not "systematically excluded." *Allen*, *supra*, 160 F.3d at 1103.

Having failed to so, Thompson has not shown trial counsel's failure to raise a fair-cross-section claim was deficient or prejudicial.[2]

### 3. Certiorari Review

Thompson also claims counsel "never informed [him] of [his] right to file a writ of certiorari to the Supreme Court as part of [his] direct review proceeding." (Doc. 88 at 7).

Even assuming this omission amounted to deficient performance, Thompson has not established prejudice.

Thompson does not say what claims he would have brought to the Supreme Court had he known about his right to file a certiorari petition.

His only argument on appeal was that police lacked reasonable suspicion to detain him in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968). The Sixth Circuit found it unnecessary to address that issue, concluding that, even if there had been no reasonable suspicion for a *Terry* stop, no

---

[2] I note counsel did, in fact, object there were no African-Americans on the venire from which the parties selected the jury, though he did not attempt to show venires within the District are under-representative *vis-a-vis* African-Americans. (Doc. 80 at 6-7).

7

seizure had occurred in any event because Thompson did not yield when the officers ordered him to stop (instead, continued on his way, then pushed one of the officers). *E.g.*, *California v. Hodari D.*, 499 U.S. 621, 626 (1991).

There is no reasonable probability that, had Thompson known he could have sought certiorari review, the Supreme Court would have granted a petition to consider any Fourth Amendment claim Thompson might have raised.

### 4. Additional Witnesses at the Suppression Hearing

Thompson contends counsel should have called three witnesses – none of whom Thompson has identified – to testify at the suppression hearing that a Toledo police officer grabbed him before Thompson shoved the officer. According to Thompson, this testimony would have undermined my ruling that no seizure had occurred because Thompson did not yield to the officer's command to halt.

Thompson cannot show deficient performance or prejudice.

First, Thompson has not alleged – let alone established – counsel knew or should have known of these witnesses at the time of the suppression hearing. Thus, I cannot fault counsel for not calling witnesses whom Thompson did not bring to his attention.

Second, even assuming these witnesses were known to trial counsel and would have testified as Thompson alleges, there is no reasonable probability I would have denied the motion to suppress.

I denied that motion for two reasons: 1) the 911 call from Alice King gave police reasonable suspicion to detain Thompson briefly to learn what, if anything, he knew about the disturbance inside the bar; and 2) alternatively, no seizure had occurred because Thompson did not yield to the officers' command to stop.

The proposed testimony at issue here, goes only to the second ruling – that is, testimony that a police officer grabbed Thompson first (as opposed to Thompson first pushing the officer) could establish a seizure did, in fact, occur.

But this testimony has no bearing on the first ruling, which I repeat here.

> With regard to the 911 call, I conclude that it was sufficiently reliable to authorize the officers to detain [Thompson] briefly to ascertain whether he was the individual about whom Ms. King had told the dispatcher. This was not an anonymous individual calling from some unknown location. Instead, she identified herself and where she was. These are facts which the officers could, had they needed to, have readily confirmed. Indeed, it is likely, that they, had they entered the bar, would have confirmed them almost immediately thereafter.
>
> The information obtained from the call was sufficiently reliable and verifiable to justify detaining – and thus seizing – the defendant briefly. It justified a "brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information" and thus was "most reasonable in light of the facts known to the officer at the time." This is particularly so, given what prompted the call for assistance – a man threatening someone in a crowded bar. At the very least, as noted, the officers were justified in trying to speak to someone who appeared to be leaving to find out whether he had any information that would help them before they went inside."

(Doc. 26 at 2-3) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

Because the proposed testimony from Thompson's unnamed witnesses does not affect my ruling on reasonable suspicion, counsel's failure to introduce that evidence was not prejudicial.

### 5. Jurisdiction

Finally, Thompson faults counsel for not investigating this court's alleged lack of jurisdiction over the offense he had allegedly committed.

Thompson contends that state authorities initially arrested him and charged him with the weapons offense, and that "a final judgment [was entered] in the state court dispos[ing of] the case." (Doc. 88 at 10). That dismissal, in Thompson's view, precluded the subsequent federal case.

9

This claim has no merit.

This court had jurisdiction over Thompson's case because the government charged him, on the basis of acts occurring within Lucas County, Ohio, with violating a federal statute.

Moreover, I take judicial notice of the fact that the state case against Thompson terminated *via* entry of a nolle prosequi order on October 13, 2011 – one day after federal authorities lodged a criminal complaint against him. *See State v. Thompson*, No. CRA-11-15525-0103 (Toledo Mun. Ct.). The fact that state authorities voluntarily decided not to pursue their case against Thompson in no way precluded the ensuing federal prosecution or deprived this court of jurisdiction.

These facts provide no basis for challenging – let alone successfully – this court's jurisdiction over Thompson's case. Counsel's failure to raise a meritless objection along these lines was neither deficient nor prejudicial.

\* \* \*

Thompson is not entitled to relief on his ineffective-assistance claim to the extent he alleges counsel should have: 1) challenged the racial composition of the petit jury; 2) advised him re. certiorari proceedings; 3) called additional witnesses at the suppression hearing; or 4) investigated this court's jurisdiction over his case.

However, I will reserve ruling on his claim that counsel should have impeached Christopher McCall with the fact of an alleged "deal" between him and the government until after the parties have made the submissions outlined above.

### B. *Johnson* Claim

In a supplement to his motion, Thompson alleges he is entitled to a new sentencing hearing under *Johnson*, *supra*, which held that imposing an enhanced sentence under the Armed Career

Criminal Act's residual clause violates due process. *See generally In re Watkins*, 810 F.3d 375 (6th Cir. 2015).

*Johnson* is of no help to Thompson, however, as I did not sentence him under the ACCA. Rather, I determined a six-year prison term, which was well below both the statutory maximum and the Guidelines range, was an appropriate sentence. Accordingly, whether any of the prior convictions about which Thompson complains qualifies as a "violent felony" under the ACCA's residual clause is irrelevant.

Moreover, Thompson's total offense level was 36, which represented: 1) a base offense level of 24; 2) a two-level increase because the firearm was stolen; 3) an additional four-level increase because he possessed the gun in connection with another felony (i.e., assault); and 4) a further six-level increase because Thompson's conduct created a substantial risk of serious bodily injury to the victim, whom Thompson knew was a police officer. (Doc. 59 at ¶¶13-24).

Assuming for present purposes Thompson's criminal history was a Category I, the Guidelines range would have been between 188 and 235 months' imprisonment (as opposed to range of 324 to 405 months' imprisonment flowing from Thompson's Category VI criminal history). Yet the actual Guidelines range was no more than 120 months' imprisonment, due to the ten-year maximum applicable to Thompson's offense, *see* U.S.S.G. § 5G1.1(a), and I determined an even lower sentence was appropriate.

In sum, even assuming the prior convictions about which Thompson complains should have played no role in determining his Guidelines range, Thompson would not be entitled to relief under *Johnson*.

11

**Conclusion**

It is, therefore,

ORDERED THAT:

1. Thompson's motion to vacate (Doc. 88) and the supplement thereto (Doc. 94) be, and the same hereby are, denied in part as provided herein;

2. The government shall, on or before March 15, 2016, supplement its opposition to the motion to vacate with an affidavit responsive to Thompson's allegation there was a "deal" whereby the government agreed to provide leniency to McCall in a case pending against him in exchange for McCall's testimony against Thompson;

3. Thompson shall, on or before May 2, 2016, file a counter-affidavit responding to the government's submission;

4. Thompson shall also file, as soon as practicable, a response or affidavit stating whether attorney Frank J. Simmons II sent him a copy of his trial file, as counsel represented in his submission of February 7, 2015 (Doc. 87); and

5. Further proceedings held in abeyance pending receipt of the submissions described above.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge